**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
CIVIL ACTION NO. 5:23-cv-0168

| | | |
|---|---|---|
| GLOBAL DIMENSIONS, LLC<br>923 Maple Grove Drive, Suite 201,<br>Fredericksburg, VA 22407,<br><br>**Plaintiff,**<br><br>v.<br><br>RANDALL TACKETT<br>136 Springside Drive<br>Spring Lake, North Carolina 28390,<br><br>and<br><br>SPECIAL OPERATIONS CONSULTING<br>AND DEVELOPMENT, LLC<br>136 Springside Drive<br>Springside Lake, North Carolina 28390<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **MEMORANDUM OF LAW IN SUPPORT**<br>**OF DEFENDANTS' MOTION TO**<br>**DISSOLVE THE CONSENT ORDER ON**<br>**PLAINTIFF'S MOTION FOR**<br>**PRELIMINARY INJUNCTION, OR, IN**<br>**THE ALTERNATIVE, TEMPORARY**<br>**RESTRAINING ORDER** |

## PROCEDURAL HISTORY

On March 31, 2023, Plaintiff filed this action against Defendant Randall Tackett "Defendant"), asserting claims for 1) breach of fiduciary duty of loyalty, 2) breach of contract – non-competition, 3) breach of contract – non-solicitation, and 4) tortious interference with economic relationship and prospective economic advantage (Dkt. No. 1). Plaintiff also filed a Motion for Preliminary Injunction or, in the Alternative, Temporary Restraining Order (Dkt. No. 3).

The Court entered an Order on April 3, 2023, stating it was not inclined to act *ex parte* regarding Plaintiff's request for injunctive relief and noticed a telephonic conference for 1:30 p.m. on April 10, 2023 (Dkt. No. 6). The conference was continued to April 11 at 1:30 p.m. (Dkt. No. 9).

Prior to conference, the parties submitted a Notice of Filing the Proposed Agreed Order on Plaintiff's Motion for Preliminary Injunction or, in the Alternative, Temporary Restraining Order (Dkt. No. 15).

On April 12, 2023, the Court entered an Order, with the consent of all parties, prohibiting Defendant from entering into any agreement with specific individuals and entities in Taiwan. The Court also ordered that Defendant return to Plaintiff all confidential/proprietary information, pursuant to the Mutual Non-Disclosure Agreement (**NDA**) (Dkt. No. 17). The Court ordered that, to the extent Defendant had not already done so, Defendant must return all property, including computers, monitors, mouses, cell phones, hard drives, sticks, USB drives, SSD drives, SSD cards, or CDs or any other electronic storage devices that have Plaintiff's data on them, as well as any documents, files or information containing Plaintiff's briefings, budgets, client lists, contact information or any other proprietary information belonging to Plaintiff. Defendant was required to return the information and materials to Plaintiff on or before April 14, 2023.[1]

The Order also provided that, if Defendant's return of the requested information was deficient, Plaintiff should notice the Court in a filing on or before April 19, 2023, describing any property or proprietary information asserted as belonging to Plaintiff and not returned by Defendant by the Order's deadline. The Order further provided that if no timely filing is made, "it shall be assumed the return described above fully was completed." Plaintiff has never filed any

---

[1] Defendant had returned to Plaintiff all documents and equipment prior to when the Court entered the April 12, 2023, Order.

2

notice with the Court indicating that Plaintiff did not receive all information, documentation, and materials requested.

The Court's April 12, 2023, Order scheduled the evidentiary hearing on Plaintiff's Motion for Preliminary Injunction for May 10, 2023 (Dkt. No. 17). During the May 10 hearing, the parties negotiated and presented an Agreed Further Order on Plaintiff's Motion for Preliminary Injunction or, in the Alternative, Temporary Restraining Order, which the Court executed on May 12, 2023, and filed under seal (Dkt. No. 34).

Both Orders from the Court relating to Plaintiff's request for injunctive relief were voluntarily consented to by Defendant and related only to contact with a specific Taiwanese entity and its representatives and to providing military training to Taiwanese citizens. The Order did not include any prohibition related to any other alleged customer or potential customer of Plaintiff. Plaintiff has not identified any other of its customers, potential or existing, that it contends the Defendant has diverted or solicited. Plaintiff has conceded that "the only violation at issue is Tackett's solicitation of TTRDA" (Dkt. No. 56 p. 6 of 12).

Defendant voluntarily consented to Plaintiff's request for injunctive relief only because all business opportunities relating to the Taiwanese entity were terminated, making the request for injunctive relief by Plaintiff moot. At no time did Defendant concede or agree that Plaintiff had met its burden on the merits with respect to its request for injunctive relief. The Court Order did not make any finding whether Plaintiff has a likelihood of success on the merits or whether Plaintiff would suffer immediate or irreparable harm absent injunctive relief.

3

## **LEGAL STANDARD**

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing the plaintiff is entitled to such relief.'" *Bryant v. Core Contents Restoration, LLC*, No. 7:20-CV-40-M, 2020 U.S. Dist. LEXIS 128277, at *1-*2 (E.D.N.C. July 21, 2020) (quoting *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 22 (2008)). The standard for a preliminary injunction and temporary restraining order are the same. *ABC Phones of N.C.*, *Inc. v. Yahyavi*, No. 5:20-CV-0090-BR, 2020 U.S. Dist. LEXIS 59047, at *5 (E.D.N.C. Apr. 3, 2020) (citation omitted). To be granted a preliminary injunction, the movant must establish each of the following four elements: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. All four requirements must be "clearly" satisfied. *Winter*, 555 U.S. at 24. Satisfying this standard is necessary because "a preliminary injunction is an extraordinary remedy never awarded as of right." *Id.*

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent[,]'" *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019) (*quoting Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)), and that the harm is likely absent immediate relief. *ABC Phones*, 2020 U.S. Dist. LEXIS 59047 at *6. The burden of showing harm is high, as "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). The courts have reasoned that only when a temporary delay in recovery of damages can

4

translate into permanent injury (i.e., driving a movant out of business before the case is resolved) would such harm be considered irreparable; "otherwise, financial losses that can be recovered by a prevailing party at the close of litigation ordinarily will not justify preliminary relief." *Mt. Valley Pipeline*, 915 F.3d at 218.

## ARGUMENT

### I. PLAINTIFF CANNOT ESTABLISH A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS ASSERTED CLAIMS.

#### 1. Plaintiff's claim for breach of fiduciary duty of loyalty fails as a matter of law because North Carolina law does not recognize a fiduciary duty running from an employee to an employer.

The allegations supporting Plaintiff's claim for breach of fiduciary duty of loyalty are identical to its contractual claims and its claim for tortious interference. Plaintiff alleges that Defendant persuaded Taiwan Mil & Le Research & Development Association (**TTRDA**) to direct business to SOC-D, and that Defendant acted in "disregard of the non-solicitation and confidentiality covenants contained in his Offer Letter and NDA, and acted to disclose and/or will inevitably disclose or use Plaintiff's Confidential/Proprietary Information" (Dkt. No. 58 ¶¶ 65-66).

This Court's determination regarding what state law applies to Plaintiff's claim for breach of fiduciary duty will govern how the claim is subject to immediate dismissal. The application of North Carolina law is fatal to Plaintiff's claim for breach of fiduciary duty because North Carolina does not recognize a fiduciary duty between an employer and employee under these circumstances.

Federal courts apply the choice of law rule of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The North Carolina Supreme Court recently clarified that cases involving torts, such as misappropriation of confidential/proprietary information, are subject to the *lex loci delicti* test. *SciGrip, Inc. v. Osae*, 373 N.C. 404, 838 S.E.2d 334 (2020). The *lex loci* test applies the law of the state where the injury or harm was suffered,

which is usually "the state where the last event necessary to make the actor liable or the last event required to constitute the tort takes place." *Warren Cty. Dep't of Soc. Servs. Ex rel. Glenn v. Garrelts*, 278 N.C. App. 140, 145, 862 S.E.2d 65, 70 (2021) (quotation omitted). Plaintiff will undoubtedly argue that it suffered injury in Virginia where its headquarters are located. This argument was recently rejected in *SciGrip, Inc. v. Osae*.

In *SciGrip,* the Court applied the *lex loci* test to plaintiff's tort claims, including an employee's alleged misappropriation of confidential information, and expressly rejected the argument that the last event necessary to create liability was the state where the corporation was domiciled. *See SciGrip, Inc. v Osae*, 373 N.C. at 424, 838 S.E.2d at 345. *See also Domtar AI Inc. v. J.D. Irving, Ltd.,* 43 F.Supp. 3d 635, 641 (E.D.N.C. 2014) (applying the *lex loci* test, the place of injury is where the actual misappropriation and use of trade secrets occurs); *Harco Nat'l Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 695, 698 S.E.2d 719, 724 (2010) (declining to create a bright line rule under the *lex loci* test that plaintiff's injury is suffered at its principal place of business); *United Dominion*, *Indus. v. Overhead Door Corp*., 762 F.Supp. 126, 129-31 (W.D.N.C. 1991) (rejecting an argument advanced in the context of an unfair and deceptive trade practices case that, for the purposes of the *lex loci* test, the location of the corporation's "pocketbook" should determine the location at which the offending conduct occurred).

The facts in *SciGrip* involved an employee who worked and resided in North Carolina and an employer corporation that maintained an office in North Carolina. The employee was the sole formula chemist at the corporation's Durham office. However, in applying the *lex loci* test, the Court in *SciGrip* determined that the circumstances did not warrant the application of North Carolina law to the employer's misappropriation of trade secrets claim, because the alleged tortious conduct/misappropriation occurred outside of North Carolina. *See SciGrip*, 373 N.C. at 424, 838

S.E.2d at 346.. *See also Smithkline Beecham Corp v. Abbot Labs*, 217 U.S. Dist. LEXIS 39264, 2017 WL 1051123 (M.D.N.C. 2017) (applying North Carolina law because it was the state "with the most significant relationship" to the facts surrounding Plaintiff's alleged economic injury).

Applying this legal principle is appropriate in this case. Defendant was hired to work at Fort Bragg in Fayetteville, North Carolina (Dkt. No. 58 Ex. B). Defendant rarely went to the Plaintiff's headquarters in Fredericksburg, Virginia – perhaps once per year. (Tackett 4th Suppl. Aff. ¶ 11.) Defendant signed the Offer Letter and NDA while in North Carolina. *Id.* ¶ 7. Defendant performed the majority of his services for Plaintiff in North Carolina.

With respect to Defendant's alleged misconduct, Defendant was in North Carolina when he received the Letter of Intent (**LOI**) from TTRDA, and he was in North Carolina when he signed and returned the LOI. (Tackett 4th Suppl. Aff. ¶ 23.) There is no allegation or evidence that Defendant was in Virginia, or any other state besides North Carolina, when Defendant engaged in the alleged tortious conduct. Under the Supreme Court's reasoning in *SciGrip,* the last alleged injurious event occurred in North Carolina and, thus, North Carolina law applies to the Plaintiff's claim for breach of fiduciary duty of loyalty.

Plaintiff cannot succeed on its claim for breach of fiduciary duty of loyalty against Defendant, as no such cause of action exists in North Carolina under the facts of this case. In *Dalton v. Camp*, our Supreme Court noted that for breach of fiduciary duty to be possible, there must first be a fiduciary relationship between the parties. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). The Court cited the general rule that "the relation of employer and employee is not one of those regarded as confidential" without the presence of components necessary to establish a fiduciary relationship. *Id.*, 353 N.C. at 651, 548 S.E.2d at 708. For such a relationship to be recognized between Plaintiff and Defendant, Plaintiff must produce evidence

that Defendant's employment resulted in Defendant's domination and influence over Plaintiff. *Id.*, 353 N.C. at 652, 548 S.E.2d at 708. There are no facts or allegations argued by Plaintiff to support such a conclusion. In fact, the terms and conditions of Defendant's Offer Letter and NDA paint a picture of totalitarian control and domination by Plaintiff's CEO, Ronald Christopher Newton.[2]

Absent an allegation and proof that Defendant dominated and controlled Plaintiff's business, the holding in *Dalton v. Camp* subjects Plaintiff's claim to immediate dismissal.

### 2. The Restrictive Covenants in Plaintiff's Offer Letter and NDA are Unenforceable as a Matter of Law.

North Carolina applies the doctrine of *lex loci contractus* to contractual claims, by which the Court will apply the substantive law of the state where the contract was formed. *Davis v. Davis*, 269 N.C. 120, 124, 152 S.E.2d 306, 310 (1967). A contract is formed "in the place at which the last act was done by either of the parties essential to a meeting of the minds." *Cole v. Champion Enters.*, 496 F.Supp. 2d 613, 621 (M.D.N.C. 2007), *aff'd*, 496 F.Supp. 613 (M.D.N.C. 2007), *aff'd*, 305 Fed. Appx. 122 (4th Cir. 2008). Thus, the court should apply the substantive law of the state where the "last act is performed which makes the agreement a binding contract." *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.,* 738 F.3d 95, 100 (4th Cir. 2013) (citation omitted). "Despite North Carolina's adherence to the presumptive rule of *lex loci contractus*," contracting parties in North Carolina may explicitly agree that a particular jurisdiction's substantive law will govern the contract, and such a provision will generally be upheld. *Volvo Constr. Equip. N. Am., Inc. v. CLM*

---

[2] For example, the "mutual" NDA provides that any "information which conflicts between signed documents will be upheld at whichever is most beneficial to Global Dimensions or which is decided to be upheld by Global Dimensions and its Owner Mr. Chris Newton" (Dkt. 58 Ex. C ¶ 9). The NDA further provides that Confidential/Proprietary Information will not be disclosed "without the specific prior written authorization of Mr. Chris Newton himself" (Dkt. No. 58 Ex. C ¶ 3). The NDA also provides that Chris Newton will determine what is an "Authorized Purpose" regarding the use of confidential/proprietary information. *Id.* The Offer Letter states that Defendant's employment is "at will" and Plaintiff can terminate him for any reason or no reason (Dkt. No. 58 Ex. B).

*Equip. Co.,* 386 F.3d 581, 602 (4th Cir. 2004) (citation omitted). However, the Offer Letter dated May 8, 2020, does not contain a choice of law provision (Dkt. 58 Ex. B). Therefore, the doctrine of *lex loci contractus* applies.

Defendant signed and dated the Offer Letter on May 11, 2020, stating that he agreed and accepted all terms and conditions of the offer. Defendant was at his home in North Carolina when he signed and dated the Offer Letter. (Tackett 4th Suppl. Aff. ¶ 7; Ex. I p. GD-000700.) Because there were no counteroffers or negotiations made by the parties beyond the terms of the Offer Letter, and because no further actions were necessary to form the contract, Defendant's act of signing the Offer Letter from his North Carolina home consummated the contract. Thus, North Carolina law applies.

Under North Carolina law, the reasonableness of a restrictive covenant is a matter of law for a court to decide. *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009). North Carolina courts will carefully scrutinize restrictive covenants because they "are 'not viewed favorably in modern law.'" *VisionAIR, Inc. v. James,* 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004) (quoting *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000)). A non-competition covenant is valid and enforceable "if it is (1) in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest of the employer." *Mkt Am., Inc. v. Lee*, 257 N.C. App. 98, 108, 809 S.E.2d 32, 39-40 (2017) (quoting *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 88, 638 S.E.2d 617, 620 (2007)). In determining reasonableness regarding time and territory, courts consider six factors: (1) the area/scope of the restriction, (2) the area assigned to the employee, (3) the area in which the employee actually worked or was subject to work, (4) the area in which the employer operated, (5) the nature of the

business involved, and (6) the nature of the employee's duty and his knowledge of the employer's business operation. *Outdoor Lighting Perspectives Franchising v. Harders*, 228 N.C. App. 613, 622, 747 S.E.2d 256, 263 (2013).

North Carolina courts have applied this same standard to non-solicitation clauses and held that a non-solicitation clause must also be reasonable as to time and geographic restrictions. *Ridgway*, 194 N.C. App. at 657, 670 S.E.2d at 328; *see also Hall v. Go to Team, Inc.,* 1:15-cv-295, 2016 U.S. Dist. LEXIS 195663 (M.D.N.C. Mar. 31, 2016). When analyzing the reasonableness of a non-solicitation clause in an employment agreement, the Court in *Hall v. Go to Team, Inc.* acknowledged that the issue of reasonableness is a question of law for the court, making the following ruling:

> Here, the non-solicitation provision contains <u>no limitation as to either its time or geographic restrictions. "A non-solicitation clause without any time restriction is clearly too broad and, therefore, unenforceable, no matter the scope of the territorial limitation."</u> *MJM Investigations, Inc. v. Sjostedt*, 205 N.C. App. 468, 698 S.E.2d 202, 2010 WL 2814531, at *5 (N.C. Ct. App. 2010) (unpublished table decision). The non-solicitation clause in Hall's contract is therefore unenforceable, and GTT's counterclaim for breach of the non-solicitation provision is dismissed.

*Hall,* 2016 U.S. Dist. LEXIS 195663, at *9-*10 (emphasis added.)

### a. The Offer Letter's non-solicitation clause does not contain any time limit and is thus unenforceable.

The sentence of Plaintiff's non-solicitation clause relevant to solicitation of customers states that Defendant "will not solicit any current customer or potential customer of Employer identified during employment with Employer, or otherwise divert or attempt to divert any existing business of Employer." This provision contains no time restriction or reference whatsoever.

Because the non-solicitation with respect to a "current customer" or a "potential customer" has no defined end, the provision is unenforceable as a matter of law.[3]

In an attempt to circumvent its failure to insert a time limitation in the non-solicitation clause contained in the "non-competition agreement," Plaintiff now contends that this Court should transfer and apply a time limitation contained in the separate and distinct NDA into the non-solicitation provision. Plaintiff takes the position that "while admittedly not worded in the clearest manner possible, this reference within the NDA to a three-year term of the 'non-compete clause' was intended to be a time limitation for the 'non-competition' clause provisions within the Offer Letter" (Dkt. No. 56 p. 4). Plaintiff continues, "In other words, the 'Term' section within the NDA was meant to carry over to the Offer Letter" because the Offer Letter and NDA "were intended to be read together as a single contract, and not as separate obligations" (Dkt. No. 56 p. 5). Plaintiff raised this argument only after Defendant filed his Motion for Judgment on the Pleadings and exposed the fatal flaw in Plaintiff's non-solicitation clause (Dkt. No. 58 ¶ 18).

Plaintiff is asking this Court to rewrite the Offer Letter and insert a time limitation that was never contemplated in the Offer Letter. Courts are not at liberty to rewrite or insert contractual terms that were not agreed upon by the parties. *See Cherry, Bekaert & Holland v. Worsham*, 81 N.C. App. 116, 344 S.E.2d 97, 100 (1986) (a court cannot rewrite or insert terms into a contract when the parties omitted such terms); *see* also *Isbey v. Crews*, 55 N.C. App. 47, 49, 284 S.E.2d 534, 537 (1981). However, that is precisely what Plaintiff is expecting from this Court.

Even if this Court were to entertain Plaintiff's attempt to expand the time period's application, the 3-year time period in the NDA makes specific reference to the "Non-Compete

---

[3] The only time period stated in the "Non-Competition Agreement" section of the Offer Letter is a 3-year limitation which, by its clear and unambiguous terms, applies only to inducing other employees to compete with Plaintiff, which is not an issue in this case. Although there is a 2-year period referenced in the relevant non-competition clause, the period relates to defining the *geographical scope*, not a time restriction on solicitation.

clause" as it is titled *in the NDA*, not the "Non-Competition Agreement" so titled in the separate Offer Letter (Dkt. No. 1 Ex. B p. 3). There is no reference in the NDA to incorporate any time period contained in the NDA into the "Non-Competition Agreement" contained in the Offer Letter, and there is no reference in either agreement that the separately prepared and separately executed documents are to be considered one singular agreement for the purposes of the time or geographic scope relating to the non-solicitation provision.

Since even before filing this action, Plaintiff has maintained the position that the Offer Letter and the NDA are separate and distinct agreements with separate and distinct terms and conditions. Plaintiff's counsel's cease-and-desist letter to Defendant stated, "In addition to the Offer Letter, you also signed a "Mutual Nondisclosure Agreement" (Dkt. No. 1 Ex. F). Plaintiff alleged that Defendant had "contractual obligations under the Offer Letter and NDA" and that Defendant should "immediately cease and desist from further violations of the Offer Letter and NDA" (Dkt. No. 58 Ex. B and Ex. C). In the cease-and-desist letter, there is no explicit or implicit intention for the Offer Letter and NDA to constitute one singular agreement. Moreover, Plaintiff's original Complaint makes no reference to merging the NDA and the Offer Letter, and Plaintiff identified the agreements as separate exhibits in both its original and its First Amended Complaint (Dkt. No. 58 Ex. B and Ex. C).

**b. The geographic scope in the "Non-Competition Agreement" is overbroad and unenforceable.**

The third sentence of the Non-Competition Agreement purports to identify a "geographical area" relating to non-solicitation and states as follows:

> The geographical area to which this non-competition agreement applies is any area in which Employer currently solicits or conducts business, <u>and/or any area in which Employer plans to solicit or conduct business for a period of two years after Employee leaves employment with Employer</u>. (Emphasis added.)

12

This "geographical area" restriction is unenforceable on its face, as it defines a geographical area as any area where the employer currently solicits or conducts business and "any area in which Employer plans to solicit or conduct business for a period of two years after Employee leaves employment with Employer." In other words, it attempts to restrict Defendant from engaging in business activities anywhere that Plaintiff might even consider conducting business in the two-year period *after* Defendant leaves the employ of Plaintiff. The geographical restriction includes unknown and undetermined places around the globe and requires Defendant to guess where Plaintiff may want to conduct business over the next two years, even if Plaintiff had never conducted business in that specific location at any time while Defendant was employed by Plaintiff.[4] A logical reading of Plaintiff's attempted restriction is that it provides an unlimited territory, which the courts have consistently held to be unreasonable in most cases. *See Prometheus Grp. Enters., LLC. v. Gibson*, 2023 NCBC 23; 2023 NCBC LEXIS 42; 2023 WL 2589284 (2023) ("Although a worldwide covenant not to compete is not *per se* invalid, the facts must be such that a worldwide restriction is reasonable and necessary"). The facts of this case do not support such a global restriction, as Plaintiff has not exhibited more than a nominal global influence in its 13 years of operation. *See* Tackett 4th Suppl. Aff. ¶ 6.

Acknowledging the obviously defective language, Plaintiff now takes the position that the Court can simply strike the offending sentence pursuant to North Carolina's "blue pencil" rule of law (Dkt. No. 56 p. 6). Plaintiff overstates the willingness of North Carolina courts to blue pencil unenforceable non-compete and non-solicitation clauses. In pertinent part, the rule of law states as follows:

> When the language of a covenant not to compete is overly broad, North Carolina's "blue pencil" rule severely limits what the court may do to alter the covenant. A

---

[4] Additionally, the geographical scope is overly broad and unenforceable because it includes anywhere the Plaintiff currently conducts business regardless of whether Defendant worked for Plaintiff in that area.

court at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable.  It may not otherwise revise or rewrite the covenant.

*Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 317, 450 S.E.2d 912, 920.  A court may not "resurrect, in whole cloth, a covenant not to compete by erasing and replacing offending, but key, portions of a contract." *Professional Liab. Consultants v. Todd,* 122 N.C. App. 212, 221, 468 S.E.2d 578, 584 (Smith, J., dissenting*) dissent adopted per curiam*, 345 N.C. 176, 478 S.E.2d 201 (1996).  *See Whittaker General Medical Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d 824, 828 (1989) (courts will not rewrite a contract if it is too broad but will simply not enforce it).

With respect to the geographic scope of a restrictive covenant, the blue pencil doctrine is unavailable when an Agreement does not contain both reasonable and unreasonable restricted territories.  *See Beverage Sys. of the Carolinas, LLC v. Associated  Bev. Repair, LLC*, 368 N.C. App. 693, 699, 784 S.E.2d at 457, 461 (2016) ("Striking the unreasonable portions leaves no territory left within which to enforce the covenant").  North Carolina courts have consistently held that when a non-competition covenant is determined to be unreasonable, "the court is powerless unilaterally to amend the terms of the contract." *Id.* at 699, 784 S.E.2d at 461 (citing *Whittaker Gen. Med. Corp.*, 324 N.C. at528, 379 S.E.2d at 828).

If this Court were to strike the flawed geographic scope language and apply a customer-based restriction, the resulting provision is still unenforceable.  Plaintiff's attempt to convert the geographic scope into a customer-based restriction fails because the customer restriction contained in the Offer Letter includes "any" and all current customers and potential customers of Plaintiff and is not limited to current customers and potential customers that Defendant had contact with while employed by Plaintiff (Dkt. 58 Ex. B).

14

According to its First Amended Complaint, Plaintiff specializes and provides services "relating in/to Language & Culture, Instructional Design & Training, Intelligence, Information Technology & Cyber, Special Operations, Consulting, and Logistics" (Dkt. No. 58 ¶ 8). With respect to Defendant's role as the Director of Special Operation Forces programs, "Tackett had worldwide responsibility for: overseeing Special Operations Command ("SOCOM") Core Services contracts and proposals/operations to contracts; managing, overseeing, and deciding opportunities of anything Special Operations related" (Dkt. No. 58 ¶ 19). There are no allegations that Defendant provided services as an employee of Plaintiff in any area other than Special Operations.[5] Given the limited work Defendant performed for Plaintiff, Defendant would not have been introduced to or forged relationships with most of Plaintiff's existing and prospective customers. (Tackett 4th Suppl. Aff. ¶¶ 8, 12.)

Under North Carolina law, an employer's failure to limit a customer-based restriction to only those customers with whom the employee had direct contact or the ability to influence renders such provision impermissibly overboard and unenforceable. *Prometheus Grp. Enters., LLC. v. Gibson*, 2023 NCBC 23; 2023 NCBC LEXIS 42; 2023 WL 2589284 (2023). *See also Andy-Oxy Co., Inc. v. Harris*, 268 N.C. App. 323, 834 S.E.2d 195 (2019) (finding a covenant unenforceable that prohibits a former employee from soliciting any customer within the restricted territory, irrespective of whether he had contact with that customer during his employ or whether that customer was even known to him); *Mech. Sys. & Servs. v. Howard*, 2021 NCBC LEXIS 69 (N.C. Super. Ct. August 11, 2021) (finding unreasonable a non-solicitation clause purporting to bar former employee from soliciting customers in any field, whether or not he had any knowledge of them or contact with them); *Sterling Title Co. v. Martin*, 266 N.C. App. 593, at 598-99 (client-

---

[5] It is also clear that, during his employment with Plaintiff, Defendant spent only 55% of his time providing services to Plaintiff relating to Special Operations and the remainder of his time on business through SOC-D.

based restriction to relate to customers with whom defendant had any form of "contact" during employment regardless of the client's location, or the extent of the client's "contact" suggests the restriction is unreasonable). In *Hartman v. W.H. Odell Assocs.*, 117 N.C. App. 307, 450 S.E.2d 912 (1984), the Court held that, in connection with the customer-based restriction, "the territory should only be limited to areas in which the employee made contacts during the period of his employment." *Id*. at. 313, 457 S.E.2d at 917. *See* also *Farr Assocs., Inc. v. Baskin,* 138 N.C. App. 276, 530 S.E.2d 878 (2000).

In the case of *Moonracer, Inc. v. Collard,* this Court recognized North Carolina's long-standing rule that a non-compete agreement is unenforceable unless it is "limited to those customers with whom the defendant had a special relationship or those who defendant cultivated during a prescribed period of employment." *Moonracer, Inc. v . Collard*, 213 U.S. Dist. LEXIS 126120 (E.D.N.C. 2013, p. 6). *See also Akzo Noble Coatings, Inc. v. Rogers*, 2011 NCBC 41, 2011 NCBC LEXIS 42, 2011 WL 5316772 (N.C. Super. Ct. Nov. 3, 2011) (provision is overbroad where it is not limited to specific customers of former employee, as such provision is unnecessary to protect the legitimate business interests of the employer). Simply striking the overly broad geographic scope and relying on the customer/potential customer-based theory does not save Plaintiff's attempted restriction because it still includes customers and potential customers of which Defendant had no knowledge and with whom Defendant had no personal or professional contact or relationship.

### 3. Plaintiff Has Failed To Meet the Elements for Its Tortious Interference Claims.

North Carolina law recognizes claims of tortious interference with contract and tortious interference with prospective economic advantage. The elements of a claim for tortious interference with contract are: (1) a valid contract between the plaintiff and a third person which

confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; and (4) in doing so acts without justification; (5) resulting in actual damage to plaintiff. *Beverage Sys.*, 368 N.C. at 700, 784 S.E.2d at 462. There is no allegation or evidence of an actual contract between TTRDA and Plaintiff. Thus, Plaintiff cannot state a claim for tortious interference with contract.

To prove tortious interference with prospective advantage, North Carolina courts have determined that a plaintiff must show the defendant induced a third party to refrain from entering into a contract with the plaintiff without justification, and that the contract would have ensued but for the defendant's interference. *See Daimlerchrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002), *disc. review denied and dismissed*, 356, N.C. 668, 577 S.E.2d 112 (2003). *See also Dalton v. Camp*, 353 N.C. at 655, 548 S.E.2d at 710 ((finding that two essential elements of a tortious interference with prospective advantage claim under North Carolina law are the "intervenor's inducement of a third party and a showing that a contract would have ensued"). Plaintiff must produce evidence to the court that a contract would have resulted but for a Defendant's malicious intervention. *Beverage Sys.,* 368 N.C.at 701, 784 S.E.2d at 463. Plaintiff cannot establish a claim by the "mere expectation of a continuing business relationship." *Id.*

Even if this Court were to apply the laws of the Commonwealth of Virginia, the elements of a cause of action for wrongful interference with a prospective business advantage or economic advantage are similar: (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued the relationship or realized the expectancy; and (4) damage to plaintiff. *Commercial Bus. Sys. V. Halifax Corp.*, 253 Va. 292, 300, 820 S.E.2d 892, 896 (1997) (emphasis

added); *see also Glass v. Glass*, 228 Va. 39, 51, 321 S.E. 2d 69, 76-77 (1984). Proof of "a plaintiff's belief and hope that a business relationship will continue is inadequate," and proof of merely a "possibility" that such benefit would accrue is insufficient. *See Commercial Bus. Sys.,* 253 Va. at 301, 820 S.E.2d at 897.

### a. There is no probability of future economic benefit for Plaintiff regarding the tactical training proposal because Plaintiff was not authorized to conduct, let alone offer, such tactical training.

Plaintiff contends that it prepared and presented a proposal to TTRDA for the purposes of securing a potential contract to train Taiwanese citizens in U.S. Special Operations military tactics in Poland and, perhaps, elsewhere. Plaintiff further contends that it was in a position to contract with TTRDA regarding this tactical training and perform tactical training as the result of an ITAR license it procured in June of 2021 (Dkt. No. 58 ¶ 27). Plaintiff acknowledges that an ITAR is required in order to discuss the export of "defense articles" such as military training (Dkt. N. 58 ¶ 27). Plaintiff also acknowledges that the ITAR license "is a prerequisite to soliciting and doing business in Taiwan as it relates to military training." *Id*. According to Plaintiff, this ITAR license gave the Plaintiff the right to discuss, offer, and perform U.S. military tactics and training scenarios to TTRDA in Poland and elsewhere. Plaintiff greatly overstates the scope of its ITAR license DSP-5 050737387; more importantly, Plaintiff neglects to acknowledge to this Court that the provisos on Plaintiff's license expressly prohibit Plaintiff from discussing, offering, or releasing military training services of U.S. origin or U.S. derivation to any non-U.S. parties.

Plaintiff's ITAR license restrictions, identified as "provisos," state that U.S. military "tactics, doctrine, rules of engagement, employment methods, intelligence gathering/target analysis, explosive breaching/entry methods or training scenarios MUST NOT be discussed,

offered, or released" (Ex. I p. GD-000270) (emphasis in original)[6].   Contrary to the clear

prohibition contained in Plaintiff's ITAR, Plaintiff is suing the Defendant for allegedly interfering

with the Plaintiff's attempts to secure a contract with TTRDA for military training, a defense

service that Plaintiff explicitly did not have the legal authority to discuss or perform under the

unambiguous terms of its ITAR license.  Plaintiff has provided no evidence that it was authorized

to provide defense services (Affidavit of Timothy M. Duffy ¶ 21).   Therefore, there was no

probability of future economic benefits to Plaintiff because Plaintiff was legally barred from even

offering to provide the training  (Affidavit of Vincent Canzoneri ¶ 19).  Plaintiff was not authorized

to conduct military training of Taiwanese individuals – or any non-U.S. entities or individuals –

anywhere in the world (*Id*. ¶ 20)[7].

> ### b. TTRDA has unequivocally confirmed it has no desire or intention to do business with Plaintiff now or in the future.

The Declaration of Raymond Lei states that TTRDA ultimately had no intention of entering

into a contract with Plaintiff. According to Mr. Lei, Plaintiff had neither the financial

trustworthiness nor the necessary experience in the specific training needs that TTRDA was

seeking (Dkt. No. 18-5 ¶ 8).  Mr. Lei's Declaration goes on to state that Plaintiff's owner and CEO,

Mr. Newton, sent communications to TTRDA requesting that TTRDA work all agreements

through Mr. Newton "despite knowing that TTRDA did not desire to have a business relationship

with GD" (Dkt. No. 18-5 ¶ 12)  (emphasis added).  Mr. Lei confirmed that TTRDA "does not

desire to be or to become a GD client" (Dkt. No. 18-5 ¶ 16).

---

[6] The documents attached as Exhibit A to this Brief are documents produced by Plaintiff in discovery.

[7] The Affidavits of Vincent Canzoneri and Timothy Duffy provide detailed information and opinions regarding the Plaintiff's lack of authority to discuss or provide military training to the Taiwanese people.

In an effort to attack Raymond Lei's Declaration, Plaintiff hired an attorney in Taiwan who sent an e-mail to Mr. Lei on April 12, 2023, questioning the validity and accuracy of his Declaration and asking, "If the declaration submitted to the U.S. District Court by Mr. Tackett's counsel has been changed we ask that you kindly assist and identify those changes" (Ex. I p. GD-000831). Simply stated, Plaintiff hired counsel in Taiwan in an attempt to undermine the Declaration of Mr. Lei. In response that same day, Mr. Lei responded to Global Dimensions' counsel, "Lawyer Xiao," stating,

> The contents of the attachment have been confirmed, it was indeed written and signed and sealed by me, and there is no problem with any falsification.

> We kindly ask for your assistance in conveying to your client.

> Good luck.

(Ex. I p. GD-000831.) Absent evidence that TTRDA intended to do business with Plaintiff, Plaintiff cannot establish to any degree, let alone with "reasonable certainty," that a contract between Plaintiff and TTRDA would ever have been realized.

Plaintiff cannot provide proof that there existed a "probability of future economic benefit" to Plaintiff through a contract with TTRDA. There is not even a possibility of future economic benefit, given TTRDA's clear stance on the status of its relationship with Plaintiff. Despite ample opportunity to do so, Plaintiff has presented no evidence, in the form of affidavit or otherwise, to rebut the facts set forth in the Declaration of Raymond Lei. In fact, Plaintiff's attempts to challenge the Affidavit's accuracy only confirm its accuracy as evidenced by Mr. Lei's response – "it was indeed written and signed and sealed by me."

**c. Any loss of business opportunity related to TTRDA was caused by Plaintiff's own conduct after learning of TTRDA's decision to do business with Defendant.**

On March 22, 2023, the TTRDA representative sent an e-mail to Plaintiff's Vice President for Intelligence,  Mr. Jim Noone, informing Mr. Noone that TTRDA "provided Randy with the letter of intent for this project" and further stated that before signing a formal contract, "all operational details and acceptance items will need to be discussed with Randy on-site" (Ex. I p. GD-000161).   TTRDA's representative noted, "Regarding the formal contract and legal procedures, we will need to further discuss after the trip to Poland" scheduled for April 10-13, 2023.  *Id*.  The e-mail concludes by stating that if there are any other questions, "please directly contact Randy for confirmation."  *Id*.  As of March 22, 2023, there was no indication that Plaintiff would not be invited to participate in some way in the project – only that Defendant and SOC-D would be the point of contact and supervise the training.

Despite the clear directive from TTRDA's representative, Mr. Newton, responded, "Just to clarify, Global Dimensions will be responsible for this project, not Randy" (Ex. I p. GD-000120). Mr. Newton's arrogance did not go unnoticed, as Mr. Lei pointed out in his sworn declaration, "Mr. Newton contacted TTRDA's representative multiple times in attempts to influence, impair, and interfere with TTRDA's contemplated agreement with SOC-D" (Dkt. 18 Ex. 5 ¶ 11).

Mr. Newton went so far as to falsely represent to Mr. Lei, in an April 3, 2023, 4:30 p.m. e-mail, that "Randy has been served a Legal Restraining order as of 31 March (he is not authorized to have discussions on any matters related to mission either directly or indirectly).  He also is not authorized to work through other companies" (Ex. I p. GD-000114).  The Court did not enter the consent restraining order until April 12, 2023 (Dkt. No. 17).  Mr. Newton was trying to intimidate TTRDA into not doing business with Defendant by making false statements that this Court had issued a "Restraining Order" when it had not.

In a March 23, 2023, e-mail to Mr. Newton, Mr. Lei also made the following statements:

- All legal documents and processes must be put on hold until we have inspected the training facilities, equipment, and project. This was the conclusion reached after the meeting with Jim and Randy in Taiwan.

- Since Randy has planned all the training aspects of this project, we have already reported it to our superiors. If your company decides to change the project manager or the project itself, it will have to be reevaluated by us.

- Let me emphasize that our superiors were highly satisfied with Randy's training content, and we fully understand Randy's training objectives and reasons. Therefore, we still prefer that Randy will be the one to carry out this project.

- This project will affect your company's future position to the current and future administration, so I suggest you to handle this matter carefully.

(Ex. I p. GD-000134.)

The string of e-mails between Mr. Newton and TTRDA's representatives immediately after Plaintiff became aware of the LOI indicate that TTRDA had not excluded Plaintiff from participation in the project, only that Defendant and SOC-D would control and manage the military training based on Defendant's knowledge and experience. Based on what TTRDA's representatives describe as Mr. Newton's "attempt to influence, impair and interfere with TTRDA's contemplated agreement with SOC-D," TTRDA ultimately concluded it "does not desire to be or to become a GD client." (Dkt. No. 18-5 ¶¶ 11, 16.) The evidence strongly suggests that it was Mr. Newton's own actions threatening TTRDA and making false representations that lead to TTRDA's decision not to do business with Plaintiff.

**4. Plaintiff's Breach of Contract Claim Related to Confidentiality and Non-Disclosure Fails as a Matter of Law.**

    <u>a. According to Plaintiff, the tactical training proposal was not confidential or proprietary, and it was not created by Plaintiff.</u>

Because Plaintiff has realized that it has no contractual claim regarding solicitation or competition, its First Amended Complaint focuses on the Defendants' use of the Plaintiff's alleged confidential and proprietary information presented to TTRDA in Taiwan. Notwithstanding the fact that Defendant created the presentation for tactical training based on his own professional knowledge and experience, Plaintiff conceded that the training proposed to TTRDA did not include novel or new concepts and that the training tactics were "standard" practices in Special Operations Training. By the Plaintiff's own admission, it did not create anything proprietary, confidential or otherwise. (Ex. I p. GD-000131.)

When Plaintiff was informed that TTRDA was not going to do business with Plaintiff, Mr. Newton barraged TTRDA and its representatives with e-mail after e-mail attempting to strong-arm TTRDA into doing business with Plaintiff (Ex. I p. GD-00076-91). This conduct resulted in TTRDA's main representative warning Mr. Newton, "I suggest you handle this matter carefully" (Ex. I p. GD-000132). In Mr. Newton's attempt to intimidate and persuade TTRDA to change its mind, he admitted that the tactical training program presented to TTRDA was not confidential or proprietary::

> The <u>training concepts presented are not novel or new concepts, they are skills, tactics, and practices that are standard in Special Operations Training</u>. Meaning there are countless other retired Special Operations Operators, who we can hire, who are just as skilled, knowledgeable, and experienced as Mr. Tackett who can just as adeptly execute Global Dimensions training plan, as presented to you by Mr. Tackett.

(Ex. I p. GD-000131.) (Emphasis added.)

Prior to this lawsuit being filed, and when it was in Mr. Newton's best interest to try to convince TTRDA to let Plaintiff perform the training, he readily admitted without hesitation that the training concepts presented to TTRDA were not novel or new concepts and were standard tactics and practices of the Special Operations training, not Plaintiff's confidential or proprietary information. Now, it is in Plaintiff's best interest to take precisely the opposite approach in order to create a fiction for this Court, that the proposed training was both confidential and proprietary, a claim that is wholly unsupported by the evidence presented by Plaintiff in this action.

### b. Defendant Tackett has returned to Plaintiff all alleged confidential or proprietary information requested by Plaintiff.

Notwithstanding the fact that Plaintiff conceded the tactical training program is neither proprietary nor confidential, the Court ordered Defendant to return all related information to Plaintiff on or before April 14, 2023. The Court Order provided that Plaintiff notify the Court in if Defendant's return of Plaintiff's alleged confidential/proprietary information was deficient (Dkt. No. 17). Plaintiff did not notify the Court of any deficiency because the Defendant no longer possessed any alleged confidential/proprietary information by that date. Thus, although Plaintiff may claim that Defendant's alleged prior use of this information justifies an award of monetary damages, Plaintiff's claim for breach of contract relating to any alleged proprietary/confidential information does not justify the imposition of injunctive relief, as Defendant has no such information in his custody on which to act.

### c. Defendant Tackett did not disseminate any confidential or proprietary information to any "other party" without authorization.

Plaintiff contends that Defendant reproduced training materials and a budget Plaintiff claims belonged to Plaintiff and presented such material to TTRDA "for his own purposes" (Dkt. No. 58 ¶ 48). Plaintiff further maintains that this conduct constitutes a misappropriation of

confidential/proprietary information belonging to Plaintiff. The problem with Plaintiff's argument is that Defendant allegedly gave to TTRDA information which TTRDA already possessed. Plaintiff knows this fact because Plaintiff's representative, Mr. Noone, was in Taiwan at the proposal meeting during the presentation of the alleged confidential/proprietary information, and Plaintiff authorized the presentation and accompanying materials in advance.

There is no allegation that Defendant misappropriated or disseminated any proprietary/confidential information belonging to Plaintiff, other than reproducing a budget and training proposal that Defendant prepared himself and provided to the very same entity that already possessed the information. Plaintiff cannot articulate any damage or injury that it sustained as a result of Defendant's giving to TTRDA something that it already possessed. Plaintiff's claim for misappropriation of confidential/proprietary information cannot serve as any basis for injunctive relief under these facts.

### d. Contrary to Plaintiff's allegations, it has not made any effort to reasonably preserve the alleged confidential/proprietary information.

Plaintiff provided the alleged confidential/proprietary information to TTRDA without any restrictions on its use. Specifically, TTRDA did not sign a non-disclosure agreement or any other agreement restricting TTRDA's receipt, maintenance, or use of the training material or the budget. (Tackett 4th Suppl. Aff. ¶ 22.) Moreover, Plaintiff has not sought any protective order and has not secured any type of confidentiality agreement, related to this alleged confidential/proprietary information during the entire course of this litigation. In fact, Plaintiff has provided to Defendant and SOC-D, in discovery and without restrictions, all the information – including the training materials and budget – that Plaintiff now claims was confidential/proprietary.

It makes no sense for Plaintiff to continue to expect any type of injunctive relief regarding the alleged confidential/proprietary information that Plaintiff has made readily available. Again,

Plaintiff is free to claim that it sustained monetary damages as a result of Defendant's allegedly reproducing the training materials and budget, but an attempt to enjoin Defendant and SOC-D from using this information with TTRDA (information that Defendant created apart from Plaintiff) is a moot point: Plaintiff already spilled the information in question.

## II. PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IF THE INJUNCTION IS DISSOLVED.

Analyzing the imminent and irreparable harm issue, this singular fact is determinative: TTRDA is not going to do any business with Plaintiff, not now, and not ever, given how Plaintiff's CEO, Mr. Newton, has tainted any potential relationship. TTRDA's representative, Mr. Lei, made this clear in his Declaration and his e-mails to Plaintiff. Plaintiff has presented no evidence that it has reinstituted discussions with TTRDA (or any similar entity in Taiwan) for the purpose of providing military training to Taiwanese individuals (something Plaintiff has no authorization to provide). This begs the question: What harm would Plaintiff suffer if the preliminary injunction is dissolved?

Plaintiff seeks monetary damages of $10,000,000 due to its loss of business advantage and opportunity with respect to TTRDA. If Plaintiff prevails, it will be awarded monetary damages for such loss of business advantage and opportunity. But this potential award of damages does not depend upon whether Defendant is enjoined from engaging in certain activities in Taiwan. The damage, if any, has been done, and if the consent injunction is dissolved, Plaintiff will not suffer any immediate or irreparable harm and will be at no better or worse position with respect to its underlying claims. Plaintiff will lose no more, simply because it has no further opportunity to have a business relationship with TTRDA.

## **CONCLUSION**

WHEREFORE, based on the foregoing factual pleadings and arguments, Defendant respectfully requests that the Court's May 12, 2023, Order be dissolved.

This, the 4th day of August 2023.

VAN CAMP, MEACHAM & NEWMAN, PLLC
*Attorney for Defendants*


By:     /s/ Thomas M. Van Camp
        Thomas M. Van Camp, NCSB # 16872
        Post Office Drawer 1389
        Pinehurst, North Carolina  28370
        Telephone:  (910) 295-2525
        Facsimile:  (910) 295-5101
        thomasv@vancamplaw.com

27

## CERTIFICATE OF WORD COUNT LIMIT

I certify that this Memorandum of Law in Support of Defendants' Motion to Dissolve the Consent Order on Plaintiff's Motion for Preliminary Injunction, or, in the Alternative, Temporary Restraining Order complies with the page limit set forth in Local Civil Rule 7.2(f) and does not exceed the maximum allotted word count of 8,400 words. This Memorandum of Law contains 8,130 words.

This, the 4th day of August 2023.

VAN CAMP, MEACHAM & NEWMAN, PLLC
*Attorney for Defendants*

By:     */s/ Thomas M. Van Camp*
        Thomas M. Van Camp, NCSB # 16872
        Post Office Drawer 1389
        Pinehurst, North Carolina 28370
        Telephone: (910) 295-2525
        Facsimile: (910) 295-5101
        thomasv@vancamplaw.com

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISSOLVE THE CONSENT ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, OR, IN THE ALTERNATIVE, TEMPORARY RESTRAINING ORDER** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing (NEF).

**WARD AND SMITH P.A.**
*Counsels for Plaintiff*
S. McKinley Gray, III, Esq.
Emily G. Massey, Esq.
Post Office Box 867
New Bern, North Carolina 28563-0867
Telephone: (252) 672-5476
Facsimile: (252) 672-5477
smg@wardandsmith.com
egmassey@wardandsmith.com


**GREENBERG TRAURIG, LLP**
*Lead counsel for Plaintiff*
Timothy C. Bass, Esq.
1750 Tysons Blvd.
Suite 1000
McLean, Virginia 22102
Telephone: (703) 749-1367
Facsimile: (704) 749-1301
basst@gtlaw.com


This, the 4th day of August 2023.

VAN CAMP, MEACHAM & NEWMAN, PLLC
*Attorney for Defendants*

By:   */s/ Thomas M. Van Camp*
Thomas M. Van Camp, NCSB # 16872
Post Office Drawer 1389
Pinehurst, North Carolina 28370
Telephone: (910) 295-2525
Facsimile: (910) 295-5101
thomasv@vancamplaw.com

29